**Cooper v. Franko**

*Robert Mongeluzzi* and *Larry Bendesky,* for plaintiff.
*John F. Kent* and *Dennis P. McBride,* for defendant.

ACKERMAN, *J.*, January 29, 1996—After a trial by jury, a verdict was entered in favor of the defendants,

Joseph Franko and Lehigh Concrete Pumping Service Inc., and against the plaintiff, Mark Cooper.

The jury specifically found that defendant, Joseph Franko, was not an employee of defendant, Lehigh Concrete Pumping Service Inc., at the time of the alleged negligence. Since the jury, in effect, thus found that defendant, Joseph Franko, was a fellow employee of the plaintiff, Mark Cooper, at the time of the incident, as a matter of law there could be no recovery against defendant, Joseph Franko, because the Workmen's Compensation Law provided the exclusive remedy for the plaintiff, Mark Cooper.

Plaintiff, Mark Cooper, filed a motion for post-trial relief essentially contending that:

(1) The jury verdict was against the weight of the evidence.

(2) The learned trial court erred in denying plaintiff's motion to strike the jury panel because of defendants' racially motivated peremptory challenges in violation of the constitutions of the United States of America and the Commonwealth of Pennsylvania.

(3) The learned trial court erred in ruling that defendants' alleged reasons for the exercise of its peremptory challenge to three African-American jurors were not pretextural.

(4) The learned trial court erred in failing to strike, for cause, two jurors who stated that they were not sure that they could be fair to plaintiff.

(5) The learned trial court erred in charging the jury that it was plaintiff's burden to prove that defendant, Joseph Franko, was not a borrowed servant.

(6) The learned trial court failed to properly, fully and clearly charge the jury that the burden of proving an employer/employee relationship in support of a bor-

rowed-servant defense is upon the party asserting that defense.

(7) The learned trial court erred in submitting the issue of whether Joseph Franko was a borrowed servant, which is an issue of law, to the jury.

After argument and hearing, plaintiff's motion for post-trial relief was denied by this court. Judgment was entered on the jury verdict, and plaintiff now appeals.

This court will review the allegations of error as follows:

## A. DID THE COURT ERR WHEN IT DENIED PLAINTIFF'S MOTION FOR A NEW JURY?

The plaintiff asserts that defendant Lehigh's use of peremptory challenges exhibits a discriminatory intent on the part of the defendant in violation of the Equal Protection Clause of the United States Constitution as prescribed by the United States Supreme Court in *Batson v. Kentucky,* 476 U.S. 79 (1986). More specifically, the plaintiff challenges defendant's use of peremptory challenges in striking jurors number 9, 12 and 13, all of whom are African-American.

Defendant contends first that at no time did the defendant strike any juror based upon his or her race. Second, defendant asserts that its actions in no way exhibited an intent to discriminate. Third, defendant asserts that it provided race-neutral justifications for striking jurors number 9, 12 and 13. Fourth, defendant asserts that the make-up of the jury was not tainted by the use of peremptory challenges.

It is well-established that the Equal Protection Clause of the United States Constitution forbids a criminal prosecutor from challenging potential jurors on the basis of their race or on the assumption that African-American

jurors as a group will be unable to be impartial in considering the state's case against an African-American. *Batson v. Kentucky,* supra at 89. In *Edmonson v. Leesville Concrete Co.,* 500 U.S. 614, 630 (1990), the United States Supreme Court extended its decision in *Batson* to apply to civil proceedings when it held that "courts must entertain a challenge to a private litigant's racially discriminatory use of peremptory challenges in a civil trial."

The *Batson* court enunciated that in order to prevail on a challenge of the use of peremptory challenges by a prosecutor, the defendant must first establish a prima facie case of discrimination. *Batson, supra* at 96. In order to present a prima facie case of discrimination, the defendant must show the following:

"(1) the defendant's membership in a cognizable racial group;

"(2) the prosecutor's use of peremptory strikes to exclude members of that group; and

"(3) an inference arising under the totality of the circumstances that the prosecutor used the strikes to exclude venirepersons on account of race." *Id.* at 96-97. See also, *Commonwealth v. Jackson,* 386 Pa. Super. 29, 562 A.2d 338 (1989) (plurality opinion), *alloc. denied,* 525 Pa. 631, 578 A.2d 926 (1990).

Upon establishing a prima facie case of discrimination, the burden shifts to the prosecutor to provide a race-neutral justification for his or her strikes. *Batson, supra* at 94; *Commonwealth v. Stern,* 393 Pa. Super. 152, 573 A.2d 1132 (1990), *alloc. denied,* 527 Pa. 610, 590 A.2d 297 (1991). The United States Supreme Court has stated that a neutral explanation means "an explanation based on something other than the race of the juror." *Hernandez v. New York,* 111 S.Ct. 1859, 1866 (1991). In addition, in assessing the legitimacy

of a peremptory challenge and the reasonableness of the prosecutor's explanation, the trial court must view the use of the challenge in light of the totality of the circumstances. *Commonwealth v. Phillips,* 411 Pa. Super. 329, 338, 601 A.2d 816, 820 (1992), *aff'd,* 534 Pa. 423, 633 A.2d 604 (1993), citing *Commonwealth v. Weaver,* 390 Pa. Super. 434, 568 A.2d 1252 (1989), *alloc. denied,* 527 Pa. 610, 590 A.2d 297 (1991).

The primary responsibility for assessing the validity of the defendant's reason for using a peremptory challenge is vested with the trial court. *Commonwealth v. Lloyd,* 376 Pa. Super. 188, 198, 545 A.2d 890, 894-95 (1988), *alloc. denied,* 522 Pa. 602, 562 A.2d 825 (1989). Pennsylvania courts have held that:

" '[A] finding of intentional discrimination is a finding of fact' entitled to appropriate deference by a reviewing court. Since the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." *Commonwealth v. Smulsky,* 415 Pa. Super. 461, 465, 609 A.2d 843, 845 (1992).

Pennsylvania courts have addressed the issue of racially motivated use of peremptory challenges on numerous occasions. Specifically, in *Commonwealth v. Jones,* 525 Pa. 323, 580 A.2d 308 (1990), *cert. denied,* 498 U.S. 1105 (1991), the Pennsylvania Supreme Court was confronted with a *Batson* challenge by a defendant to the use of a peremptory strike by the prosecutor in striking the sole African-American from the jury venire. When asked to articulate her reasons for striking the African-American prospective juror, the prosecutor responded that she struck the juror because she lived in close proximity to the defendant's alibi witness and the juror had ten children living in the defendant's im-

mediate neighborhood. The defendant challenged the prosecutor's use of this peremptory challenge by asserting that the prosecutor had failed to challenge another white juror residing in the same locale.

In ruling that the prosecutor had presented a race-neutral justification for striking the African-American prospective juror, the court stated that "[w]ere these two jurors possessed of such similar characteristics that all that separated them was their race, we would indeed be compelled to agree with [the defendant's] position." *Id.* at 328, 580 A.2d at 311. The *Jones* court found, however, that because the white venireperson did not have children, the white venireperson would "not be subject to the same network of possible intrusive information as [the African-American venireperson]." *Id.* In other words, because there were reasons beyond race which occasioned the challenge, the *Batson* rule was not violated.

In *Commonwealth v. Lloyd, supra,* the defendant made a similar argument. In this case, the prosecuting attorney challenged five of six black persons from the panel of prospective jurors. Upon a finding by the trial court that a prima facie case of discrimination had been established, the prosecutor was called upon to give race-neutral explanations for the use of the peremptory strikes. The prosecutor explained that he had struck two of the black venirepersons because they were young and unemployed, one because she lived in the town where the crime was committed and she was friendly with a fact witness which the prospective juror herself admitted may affect her decision; one because he lived in the town where the crime was committed; and one because he was observed dozing during jury selection and made faces during the voir dire. *Id.* at 195-96, 545 A.2d at 894.

The appellant argued that while these explanations on their face appear to be race-neutral, they were, in fact, discriminatory because the prosecutor did not apply the same criteria to prospective white jurors. *Id.* While the *Lloyd* court acknowledged that such an argument had merit the record did not support the appellant's averments. Therefore, the *Lloyd* court deferred to the findings of the trial court and found that the prosecutor had presented race-neutral justifications for striking the African-American venirepersons.

In *Commonwealth v. Correa,* 423 Pa. Super. 57, 620 A.2d 497 (1993), *alloc. denied,* 536 Pa. 638, 639 A.2d 24 (1993), the Pennsylvania Superior Court was faced with a *Batson* challenge following a prosecutor's use of peremptory challenges in striking six blacks and one Filipino from the jury venire. The record reflected that the defendant objected to the prosecutor's use of peremptory challenges after the prosecutor exercised her first four peremptory challenges striking three African-American and one Filipino prospective jurors. Immediately following the *Batson* challenge, the Commonwealth was asked to set forth its reasons for its first four peremptory challenges.

In justifying the peremptory strikes, the prosecutor stated that she struck the first African-American venireperson because she was a social worker and "she generally does not want jurors who are involved in 'social work.' " *Id.* at 62, 620 A.2d at 499. The prosecutor stated that she struck the Filipino woman because she was difficult to understand. *Id.* Lastly, the prosecutor stated that she excluded another African-American venireperson because her husband was unemployed and she "preferred jurors whose personal lives were 'stable.'" *Id.* at 62, 620 A.2d at 500. The court noted in a footnote that upon a review of the record it was apparent that

the prosecutor's failure to give a reason for her fourth peremptory challenge was merely an oversight.

In finding that the prosecutor presented race-neutral justifications for her use of peremptory strikes and that no *Batson* violation had occurred, the *Correa* court stated:

"The following facts have influenced our decision. The jury as finally selected was equally divided between Black and White members, and although the Commonwealth had one peremptory challenge still available, it did not use it to exclude another Black venireperson. Although appellant is Hispanic, the case did not involve any issues of race. The district attorney specifically denied using her strikes in a racially motivated manner and, most significant of all, she offered race-neutral reasons for three of her first four peremptory strikes." (footnote omitted) *Id.* at 66, 620 A.2d at 501.

It is undisputed that in the instant action the defendant struck three prospective African-American jurors with its peremptory challenges. Defendant vehemently asserts that its striking of three African-American prospective jurors was in no way racially motivated. The three African-American prospective jurors struck by the defense were juror number 12, Donald Pressley, juror number 13, Gloria Guy, and juror number 9, Almetta Mack. The defendant asserts that it provided race-neutral justifications for the striking of each one of these individuals.

When examining the "race-neutral justification" of the *Batson* test, the "process does not demand an explanation that is persuasive, or even plausible." *James Purkett v. Jimmy Elem,* 115 S.Ct. 1769, 1770, 1771 (1995) quoting *Hernandez v. New York,* 500 U.S. 352, 358-359, 111 S.Ct. 1859, 1865-1866 (1991) (plurality opinion). "At this step of the inquiry, the issue is the

facial validity of the prosecutor's [defense counsel's in a civil case] explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Hernandez, supra* at 360, 111 S.Ct. at 1866. The *Batson* court found that the proponent of a strike must give "a clear and reasonably specific explanation of his legitimate reasons for exercising the challenges." *Batson, supra* at 98 n.20, 106 S.Ct. at 1724 n.20. However, the *Purkett* court modified *Batson* by adding: "what it means by a 'legitimate reason' is not a reason that makes sense but a reason that does not deny equal protection." *Purkett, supra* at 1771.

Counsel for defendant explained to the trial court that the defense struck Donald Pressley because "he did have a positive response when asked with respect to carpal tunnel syndrome." (Tr. trans. at 2.7.) As the court is aware, carpal tunnel syndrome is one of the afflictions plaintiff claims to suffer from as a result of the accident at issue.

Counsel for defendant also stated that based upon its voir dire of Mr. Pressley, counsel for defendant was suspicious of Mr. Pressley's sexual orientation. As counsel for defendant explained, because there were some comments regarding social orientation within a number of the doctor reports which were expected to be entered into evidence, counsel for defendant had "a certain level of discomfort with Mr. Pressley." (Tr. trans. at 2.8.) Based upon either reason asserted by counsel for defendant, it is clear that Mr. Pressley was not struck from the jury because of his race, but rather because of his positive response to carpal tunnel syndrome and the defendant's discomfort with Mr. Pressley's sexual orientation.

Counsel for defendant explained that Gloria Guy was struck by the defense due to her lack of education. On her juror questionnaire, Ms. Guy indicated that she

completed only 11 grades and counsel for defendant stated that, in his opinion, "this is a case that required a certain level of educational prowess in understanding the medical issues." (Tr. trans. at 2.9.) Counsel for defendant also stated that Ms. Guy was struck because she has six children, one of whom is a male in the same general age category as the defendant. It cannot be disputed that both reasons asserted by counsel for defendant for the striking of Ms. Guy are race neutral.

Lastly, defense counsel struck Almetta Mack. Counsel for the defendant states that he struck Ms. Mack because she has a son in the same age category as the plaintiff, and "it [the striking of Ms. Mack] seemed to make sense to us from the point of view of obtaining the most neutral juror we could." (Tr. trans. at 2.10.) Although her questionnaire does not list her educational level, the fact that she was a separated housewife and unemployed for the past 10 years instinctively caused defense counsel pause since he envisioned a conservative, stable jury. Accordingly, Ms. Mack was struck from the jury venire for reasons other than race.

The plaintiff first challenges the defendant's striking of Gloria Guy. As previously stated, Gloria Guy was struck by the defense because of her lack of education and the fact that she had children around the same age as the plaintiff. Plaintiff's primary argument with respect to the striking of Ms. Guy is that the defense failed to challenge white venirepersons with only one more year of schooling.

The plaintiff first points to Sophy Phork, a white woman who served on the jury, who had one additional year of schooling than Ms. Guy. The defendant asserts that not only did Ms. Phork complete 12 years of education and, therefore, the defense concluded that she received a high school diploma, Ms. Phork indicated

on her juror questionnaire that she was furthering her education through vocational training. These factors coupled with the fact that Ms. Phork does not have children the same age as the plaintiff provide a basis other than race for the defendant to strike Ms. Guy and not Ms. Phork.

The plaintiff asserts that the defendant's failure to question Joan Elisii and Dorothy Hayes, who both had one more year of schooling than Ms. Guy, also exhibits defendant's discriminatory intent. As stated above, if a juror stated that he or she had completed 12 years of schooling, the defendant assumed that the individual had received a high school diploma. Ms. Guy completed only 11 years of schooling and, therefore, was not a high school graduate. In addition, there was no indication that Ms. Guy obtained a G.E.D. or high school equivalency diploma. For this reason, the defendant did not strike either Ms. Elisii or Ms. Gallagher. Also defense counsel selected Alice Blyth, juror number 6, a black woman with 15 years of education.

Finally, the plaintiff asserts that the defendant's "peremptory scheme" is highlighted by the defendant's failure to strike Helen Gallagher as contrasted with its use of a peremptory challenge to strike Ms. Guy. Ms. Gallagher is a white female who sat on the jury. On her juror questionnaire, Ms. Gallagher failed to indicate her level of education. However, Ms. Gallagher did state that she had 11 children, was a retired widow and her deceased husband was a former officer in the Department of Licenses and Inspections. In addition, Ms. Gallagher indicated that she had a close affinity to individuals employed in the law-related, health-related and law enforcement professions. Experience, instinct and advocacy suggests that if race is truly a neutral factor, there should be no affirmative obligation on the

attorney exercising a peremptory challenge to select either way. Accordingly, if the attorney senses an advantage to selecting jurors without reference to race, any further consideration having to balance some racial scale would be inconsistent with fairness to that party exercising the challenge. Hence, the inclusion of Ms. Gallagher.

In his challenge of the defendant's use of a peremptory strike against Ms. Mack, the African-American venireperson who was struck because she had children the same age as the plaintiff and was a separated housewife, plaintiff points to defendant's failure to challenge Robert Fox and Donald Murray. As set forth above, during voir dire, Mr. Fox presented himself as a prospective juror who was favorable for the defendant. More telling, however, is the fact that the plaintiff used two of its peremptory challenges to strike Mr. Fox and Mr. Murray and, therefore, there was no need or opportunity for the defendant to challenge the presence of either one of these individuals' presence on the jury.

The case of *Jones v. Ryan,* 987 F.2d 960 (3d Cir. 1993), cited by the plaintiff, is easily distinguishable from the case at bar. There the prosecutor *admitted* that he excluded jurors who were of the same race as the defendant.

The case of *Commonwealth v. Rico,* 443 Pa. Super. 507, 662 A.2d 1076 (1995), also cited by the plaintiff, is not applicable because the prosecutor in that case exhibited blatant discriminatory intent in failing to apply the same criteria to the white venirepersons as he did to the black venirepersons.

In this case, the defense provided race-neutral justifications for striking Donald Pressley, Almetta Mack and Gloria Guy. Those reasons or justifications need not be "persuasive or even plausible." *Purkett, supra* at 1769, 1771.

In the instant case, it is apparent that the jurors were not objected to on racially motivated grounds. Both jurors were struck for reasons that directly related to the nature of the case. The explanation also qualified as an adequate race-neutral reason for exercising peremptory challenges. *See Purkett, supra* at 1771 [finding that prosecutor's reason for striking juror, he disliked juror's haircut and facial hair, was legitimate race-neutral explanation]. Thus, striking the three jurors in this instance was clearly not an attempt at any race specific discrimination. When the court inquired as to whether race entered into defense counsel's decision to strike the jurors, counsel credibly denied any racial motivation. In light of the explanations given by defense counsel and the court's review of these reasons and its assessment of credibility, there was no error in denying the motion for a new jury. Accordingly, plaintiff's motion for a new trial on this issue was denied.

## B. DID THE COURT ERR WHEN IT REFUSED TO STRIKE JURORS NUMBER 3 AND 5, ROBERT FOX AND FRANCENIA MOTT FOR CAUSE?

It is well established in the Commonwealth that the test for the disqualification of a prospective juror for cause centers around the prospective juror's ability and willingness to eliminate the influence of his or her scruples and render a verdict according to the evidence. *Commonwealth v. Lane,* 521 Pa. 390, 396, 555 A.2d 1246, 1249 (1989), citing *Commonwealth v. Bighum,* 452 Pa. 554, 307 A.2d 255 (1973); *Commonwealth ex rel. Fletcher v. Cavell,* 395 Pa. 134, 149 A.2d 434 (1959), *cert. denied,* 361 U.S. 847 (1959) and *Commonwealth v. Gelfi,* 282 Pa. 434, 128 A. 77 (1925). The judgment of a prospective juror's ability to be

impartial is made based upon the prospective juror's answers to voir dire questions and his or her demeanor.

In evaluating a juror's ability to be fair and impartial, the underlying questions for the court are whether the prospective juror has formed a fixed opinion or is willing to be guided by the evidence, *Lane, supra* at 396, 555 A.2d at 1249, and whether any biases or prejudices can be put aside upon the proper instruction of the court. *Commonwealth v. Ingber,* 516 Pa. 2, 7, 531 A.2d 1101, 1103 (1987). See *e.g., Commonwealth v. Mignogna,* 401 Pa. Super. 188, 201, 585 A.2d 1, 7 (1990), *alloc. denied,* 530 Pa. 660, 609 A.2d 167 (1992) (scope of voir dire limited to determining whether a juror has a fixed opinion or may otherwise be subject to disqualification for cause). "Those [venirepersons] who express an inability to render a fair and impartial decision are subject to a challenge for cause." *Commonwealth v. Jermyn,* 516 Pa. 460, 488, 533 A.2d 74, 87 (1987), *cert. denied,* 114 S.Ct. 703 (1994). "In addition, those venirepersons thought to be unfavorably disposed to the positions of the respective parties may be removed through the exercise of *peremptory challenges." Id.* (emphasis added)

In reaching a conclusion regarding a juror's ability to be fair and impartial, the Pennsylvania Supreme Court has stated that:

"The examination of jurors under voir dire is solely for the purpose of securing a competent, fair, impartial and unprejudiced jury. . . . [T]he scope of a voir dire examination rests in the sound discretion of the trial judge and *his decisions, even in a challenge for cause, will not be reversed in the absence of palpable error."* (emphasis in original) *Commonwealth v. Smith,* 518 Pa. 15, 37, 540 A.2d 246, 257 (1988). See also, *Wainwright v. Witt,* 469 U.S. 412, 424-26 (1985) (finding

regarding a venireperson's impartiality is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province).

In *Commonwealth v. Ingber, supra* at 4, 531 A.2d at 1101, the presence of a juror who stated that she was predisposed to credit the testimony of a police officer over that of a civilian witness was challenged for cause. The Pennsylvania Supreme Court reversed the trial court's decision to deny the challenge for cause because the Supreme Court found no indication in the record that the juror was questioned as to whether she would be able to put aside her feelings and evaluate the evidence in accordance with the court's instructions. *Id.* at 7, 531 A.2d at 1103. The *Ingber* court did state, however, that had there been evidence in the record to support the trial court and the Commonwealth's assertion that the juror in question stated that she would be able to decide the case solely, strictly and entirely based upon the evidence presented in the courtroom and the law as submitted by the court without any outside bias or prejudice, the court's decision may have been different. *Id.* at 8 n.3, 531 A.2d at 1103-1104 n.3.

In *Commonwealth v. Lane, supra*, the Pennsylvania Supreme Court affirmed the Pennsylvania Superior Court's decision overruling the trial court where the Superior Court had held:

"[W]e believe the [trial] court erred when it granted the Commonwealth's challenge for cause: (1) because the court dismissed a juror who expressed a legitimate question as to a potential weakness in the Commonwealth's case; and (2) because the court's action may have had a prejudicial effect on the jury members that sat in appellant's case." *Id.* at 395, 555 A.2d at 1249.

In *Lane,* the following colloquy occurred between the court, the attorneys and the prospective juror:

60

"[Defense Counsel] Q: It is my recollection of what you said, that you indicated that you may very well be affected by the length of time between the alleged offense and the date when it was reported, is that correct?

"A: That's correct, that part, yes.

"[Defense Counsel] Q: I thought you also indicated that you felt that you would be able to listen to the evidence and decide the case based on evidence.

"A: Just based on the evidence, right; but still, like I say, the evidence I can go 100 percent with the evidence, if [sic] just the point that there was such an elapsed time that we should really—that would really be the point that I felt would just not make a—

"[Defense Counsel] Q: Let me ask you this—

"A: That may still have some of the doubt in my mind.

"[Defense Counsel] Q: About what, sir?

"A: the facts were all reported to me, and to the jurors, then you know that would be it. Then, I would go strictly on them facts; it's just the point that to me it seems impossible that they should wait so long when they have a child at that age.

"[Defense Counsel] Q: Are you saying that you would listen to the evidence?

"A: I would listen to the evidence, right.

"[Attorney for Commonwealth] Q: When you first answered this line of questioning, is it not true that you said you didn't think you could be a fair juror?

"A: Yes . . . but just like I say, it's—it seems almost impossible that someone would wait that long to, you know, to me it's—but, like I say, I would weigh the facts.

"[Attorney for Commonwealth] Q: That is along with all of the other facts?

"A: All of them together, that would have to be concluded in my mind right there to be honest, that could be one of the facts.

"[The Court] Q: Do you feel you could be a fair juror?

"A: I feel I could be fair, but I am still saying after that, all the facts that will be presented the fact that was brought out here at this time would still be in my mind, and I would still try to be as fair as possible." *Id.* at 394-95, 555 A.2d at 1248-49.

Upon review of the record, the Pennsylvania Supreme Court found that it was an abuse of discretion for the trial court to strike the prospective juror for cause when the record reflected only that the prospective juror might place great weight upon a belated accusation against the accused. *Id.* at 397, 555 A.2d at 1250. More importantly, however, the court stated that its decision largely turned upon the juror's statement that he could be fair and that he would assess the fact of the delayed accusation in light of all other evidence presented. *Id.*

In the instant action, the plaintiff has asserted that the trial court erred when it denied the plaintiff's motions to strike for cause jurors number 3 and 5, Robert Fox and Francenia Mott, respectively. Taking plaintiff's assertions in turn, plaintiff first asserts that Mr. Fox's response that he would have problems being fair to the plaintiff, exhibits an overriding bias making Mr. Fox subject to being stricken for cause. In addition, plaintiff asserts that Mr. Fox's bias is exhibited by his response on the juror questionnaire that he would have problems following and applying the judge's instructions on the law. Defendant respectfully contends that, when viewing the entire line of questioning of Mr. Fox as a whole, it is clear that the trial court properly found that Mr. Fox was able to put aside any bias

he had toward the plaintiff and impartially view the evidence presented.

The following portions of Mr. Fox's testimony support defendant's assertion:

"[By the Court] Q: The first thing all jurors have to do is they must follow the instructions as to the law as given by the court. Would you be able to follow the instructions that I give you as to the law?

"A: Yes.

"Q: By doing that, would you be able to put aside any feelings or thoughts that you might have, either as to what the law is, or what the law should be, and solely follow the instructions as to the law as given to you by this judge; can you do that?

"A: I might have a problem with that because of what happened to me before.

"Q: All right, I want to thank you for being honest with the court and with the lawyers. We are talking about problems. I want you to understand that you must, you must, you have no leeway, you must follow all instructions that this judge gives you as to the law and put aside any feelings that you have with regard to the law. The basis of our jury system is to obtain a fair and impartial jury who must determine the facts fairly and impartially, and without any reliance or feelings of bias or prejudice or sympathy. It's going to be part of my instructions. All jurors who can and will sit, will have to be able to be fair in that regard. Can you be fair in that regard?

"A: I could probably be fair in that regard, but it would still have to be me, what is right and what is wrong is wrong, that is it.

"Q: No question about that. I'll instruct you as a member of the jury as to burden of proof and how

you determine burden of proof. I'll instruct the members of the jury that burden of proof is determined in a civil case by the weight of the evidence, preponderance of the evidence. The balance scale test, I'll go into that. That is a jury function. A jury has to listen to the facts and make a determination just what were the facts on this day in question. After you determined the facts, then you apply the law as I give it to you. Would you be able to do it that way?

"A: Yes.

"Q: Let's talk about fairness. I understand it has been brought to my attention you have indicated that you were sued a couple of times.

"A: Yes.

"Q: Because you were sued a couple times it might be difficult for you to be fair to the plaintiff, is that what you said?

"A: Yes.

"Q: I want you to understand, none of us are machines and robots. We all have personal feelings. The important thing is to do justice. This plaintiff had nothing to do with the lawsuit that was brought against you.

"A: No.

"Q: These lawyers didn't have anything to do with the lawsuit that was brought against you?

"A: No.

"Q: None of the parties of this litigation were in any way unfair to you in the other matters litigated, is that correct?

"A: You're right.

"Q: That being the case, could you, if I asked you to, and tell the jury to put aside any personal feelings that you might have, would you be able to do it in

this case and be fair to the plaintiff and also be fair to the defendant, would you be able to do that?

"A: Possibly.

"Q: I want you to understand there are no guarantees in life. Your answer possibly is an honest answer and I accept it as that. But I have to go a little further. I have to make a decision and I want to make sure that when you use the term possibly I understand what it means. When you say possibly, does that mean there is a possibility that you could not be fair to the plaintiff, or does it mean that you would have to weigh the evidence in order to make a determination?

"A: I would have to weigh the evidence myself.

"Q: There is nothing wrong with that. When you use the word possibly, does it mean you might not follow the instructions as to the law that this court gives, or that you will follow the instructions and then apply it to the evidence as you find it?

"A: I would follow the court's instruction of course.

"Q: And apply it to the evidence as you find it?

"A: Of course." (Tr. trans. 1.25-1.29.)

The above colloquy indicated that as in *Lane, supra,* the trial court correctly determined that Mr. Fox was able to put aside his bias which had arisen from his involvement in prior lawsuits and be a fair and impartial juror. Mr. Fox repeatedly stated that he would be able to follow the court's instructions and make his decision based upon the evidence presented.

The plaintiff argues that Ms. Mott should have been stricken for cause because Ms. Mott stated that she would "lean towards the company" due to her employment with a construction company and her reluctance to award the plaintiff substantial money damages. Upon a close review of Ms. Mott's voir dire, it is apparent

that the trial court correctly determined that Ms. Mott could set aside her bias and be a fair and impartial juror.

"[By the Court] Q: The important thing for me to ask is whether or not you can be fair. Is there anything that would give you pause to say to this judge, that for some reason, I don't think I can be fair to either or both the plaintiff or the defendant in this case?

"A: I can be fair, sir. Right now, just knowing what I know, I would lean towards the companies. Not knowing all the details. . . .

"Q: Any reason why you could not follow my instructions?

"A: No.

"Q: Your duties and responsibilities are only a factual one. It is to determine just what were the true facts on this day in question. How did the accident arise and then determine, based on the facts, whether or not a particular person or persons or company or companies were responsible. Do you understand that?

"A: Yes, sir.

"Q: Would you be able to do that?

"A: (Nodding)

"Q: If the facts show a company is in fact responsible, would you be able to determine the issue of negligence against the company?

"A: If it's proven it's their fault.

"Q: By the same token, if the facts show they were not responsible, would you be able to resolve that issue of negligence in behalf of the company?

"A: Certainly.

"Q: Is there any reason that you know, in your own mind, that if the evidence that you discuss with the jurors at the conclusion of the case shows that a company is responsible for this accident, that you would not be able to find against that company?

"A: No.

"Q: Would you be able to follow all of the court's instructions, especially those which say that you have to be fair to all parties, both the plaintiff and the defendant, and be fair to all parties no matter whether they are corporations or individuals, would you be able to do that?

"A: I believe so.

"Q: Would you be able to determine the case on the basis of the evidence that you hear and not resort to any feelings of bias, prejudice or sympathy to anyone, could you do that?

"A: I would give it my best." (Tr. trans. at 1.32-1.38.)

Ms. Mott's testimony as set forth above, and in its entirety exhibits that Ms. Mott was able to set aside her bias in favor of the defendant and evaluate the case on the evidence presented and the instructions given.

In making his argument that the trial court erred in denying his motions to strike Mr. Fox and Ms. Mott for cause, the plaintiff cites to a recent decision of the Third Circuit Court of Appeals in *Raymark Industries, Inc. v. Kirk,* 61 F.3d 147 (1995). In *Kirk,* the defendant challenged the trial court's refusal to grant two motions to strike prospective jurors for cause. As the plaintiff sets forth more fully in his brief, *Kirk* involved a case where the plaintiff's decedent was seeking compensation for injuries and damages suffered as a result of prolonged exposure to asbestos. During voir dire, the trial court denied defendant Owens-Corning Fiberglas's motions to strike for cause jurors number 251 and 45.

The Third Circuit Court of Appeals reversed the trial court's decision with respect to both jurors. In reaching

its conclusion, the *Kirk* court stated that the following factors raise substantial questions of the potential bias of juror number 251:

"(1) during the course of [juror #251] work history he had 'probably eaten a couple of pounds of [asbestos]';

"(2) he was a union shop steward for 35 years and received one-sided literature from the union regarding asbestos;

"(3) he believed that 97 percent of the older workers in his local union had tested positive for asbestos in their system;

"(4) he had two uncles who died of lung cancer and although they were cigarette smokers, they had been exposed to asbestos during the course of their work lives;

"(5) he admitted in the first instance that he was leaning in favor of the plaintiff and against the asbestos company;

"(6) he believed that he was 'probably high on the priority list' of getting an asbestos-related disease; and

"(7) he knew 'a lot of [union] members who presumably had asbestos-related medical problems.' " *Kirk, supra* at 154.

When juror number 251 was asked if in light of his history of working with asbestos he would be able to listen to the evidence and be fair to both sides, he responded that "I could only try to be fair is all I could say . . . in a way I got to be a little one way, I'm probably high on the priority list myself." At no time did juror number 251 state that he felt he could be a fair and impartial juror. Based on the above evidence regarding juror number 251, the *Kirk* court stated that "because his background is replete with circumstances which would call into question his ability to be fair

68

to an asbestos manufacturer, we find that the district judge should have removed this juror for cause." *Id.* at 155.

In assessing the district court's denial of Owens-Corning's motion to strike juror number 45 for cause, the *Kirk* court found that they were troubled by the following factors:

"(1) the juror's statement on the questionnaire that he could not be fair to companies that made, distributed, supplied and/or installed asbestos-containing materials;

"(2) the juror's belief that it was immoral to produce asbestos if the company knew it was going to cause a problem; and

"(3) the juror's indication that he could not be fair to the defendant if the evidence indicated that Owens-Corning knew that asbestos was hazardous."

In finding that juror number 45 should have been stricken for cause, the court stated that a danger existed that this juror would return a verdict of liability against Owens-Corning even if Owens-Corning's products were not responsible for the decedent's injuries. In addition, the court stated "[w]e can think of few admissions more compelling in asbestos litigation than a prospective juror who acknowledges that he would have moral qualms about being fair to an asbestos manufacturer."

Unlike the situation presented in *Kirk* where the prospective jurors at issue exhibited a clear bias against the defendant Owens-Corning and, *at no time stated his or her ability to set aside said bias and be fair and impartial,* in the instant action, upon questioning by the court, both Mr. Fox and Ms. Mott stated that they could be fair and impartial. While the court is not permitted to rely heavily on the jurors' assurances of impartiality, *see Kirk, supra* at 153, when viewing

the voir dire of Mr. Fox and Ms. Mott in its entirety, this court finds that it did not commit palpable error in denying the plaintiff's motion to strike these jurors for cause.

## C. DID THIS COURT ERR IN SUBMITTING THE "BORROWED-SERVANT" ISSUE TO THE JURY?

The defendant contends that the issue of whether, at the time of the plaintiff's accident, Joseph Franko was acting as an employee of Tony DePaul & Son or Lehigh was a question of fact properly submitted to the jury. In his motion for judgment n.o.v. or a new trial, plaintiff asserts that this issue presents a question of law and, therefore, it was a matter for the trial court to decide. In making this argument, the plaintiff cites to *W.W. Friedline Trucking v. W.C.A.B. (Reynolds),* 151 Pa. Commw. 38, 616 A.2d 728 (1992), *alloc. denied,* 533 Pa. 640, 621 A.2d 584 (1993) and the seminal case of *Mature v. Angelo,* 373 Pa. 593, 97 A.2d 59 (1953).

In *W.W. Friedline Trucking v. W.C.A.B., supra,* citing, *Mature v. Angelo,* in which the Pennsylvania Supreme Court set forth a seven-part test to determine whether a servant furnished by one employer to a second employer becomes an employee of the second employer it states:

"(1) One who is in the general employ of one employer may be transferred to the service of another in such a manner that the employee becomes an employee of the second employer;

"(2) whether or not the transferred employee becomes the employee of the second employer depends on whether the first employer passes to the second employer

not only the right to control the employee's work, but also his manner of performing it;

"(3) it is enough to establish the employer-employee relationship if the employer has the right to control the employee's manner of performance of work, regardless of whether the right is ever exercised;

"(4) where one is engaged in the business of renting out trucks and furnishes a driver as part of the hiring of the truck, *there is a presumption that the driver remains in the employ of his original employer until there is evidence that the second employer in fact assumed control over the employee's manner of performing his work;*

"(5) facts which indicate that an employee remains in the service of his original employer include the original employer's right to select the employee to be loaned and to discharge him at any time and send another in his place, the loaned employee's possession of a skill or special training required by the work for the second employer, and employment at a daily or hourly rate for no definite period;

"(6) *the fact that the second employer designates the work to be done and where it is to be done does not militate against the first employer-employee relationship;* and

"(7) when the facts are undisputed, the determination of who is the employee's employer is one of law, but when the facts are disputed, the determination is one of fact." (emphasis in original) *Id.* at 41-42, 616 A.2d at 729-30.

In his brief, the plaintiff asserts that the borrowed-servant issue should have been determined by the trial court as a matter of law because the "evidence is uncontradicted that Joseph Franko was an employee of

Lehigh at the time of plaintiff's accident." The issue of who had the right to control Mr. Franko at the time of the accident was hotly contested. Moreover, the evidence presented by both plaintiff and defendant on this issue was contradictory and led to different inferences regarding who was Mr. Franko's employer at the time of the accident.

If we analyze the principles of the *Mature* case as applied in the *Friedline* case, we determine that defendant Franko, who was in the general employ of defendant Lehigh, "may be transferred to the service" of DePaul "in such a manner that the employee becomes an employee of the second employer," DePaul. (Principle 1.)

Whether defendant Franko becomes the employee of DePaul depends on whether the first employer, defendant Lehigh, passes to the second employer, DePaul, not only the right to control defendant Franko's work, but also his manner of performing it. (Principle 2.)

Although plaintiff argues that DePaul "must assume actual control over Franko's manner of handling the control box," Principle 3 establishes that the "right to control the employee's (Franko's) manner of performance of work" is controlling "regardless of whether the right is *ever exercised.*" (emphasis added)

In this case, defendant Lehigh is engaged in the business of renting out pump trucks and furnished defendant Franko as a part of the hiring of the truck. "There is a presumption that the driver (Franko) remains in the employ of his original employer (Lehigh) until there is evidence that the second employer (DePaul) *in fact assumed control* over the employee's (Franko's) manner of performing his work." (Principle 4.) (emphasis added) Principle 4 does not use the word "exercised" referred to in Principle 3 and, thus, it is clear that Principle

3 still applies in the fact context of Principle 4. In fact, in the *Friedline* case, the court looked to the "actual conduct of the parties and whether *Friedline actually had the power to control claimant's work and manner of performance.*" (emphasis added) *Id.* at 42, 616 A.2d at 730. *Friedline* did not require that the second employer actually exercise the right of control but only that *in fact* it *had* the *power* to control the work and manner of performance. The word "assumed" in Principle 4 merely means that the power of right to control *in fact* was *transferred* and does not mean that after transfer it must in fact be *exercised.*

The record establishes that on September 21, 1988, plaintiff Mark Cooper was injured while working within the scope of his employment for Tony DePaul & Son, a general contractor. DePaul had been hired to act as the general contractor for a road-widening project located at Second Street Pike in Philadelphia, Pennsylvania.

In order to complete the road-widening project, DePaul leased the services of defendant Lehigh to assist DePaul in pouring the concrete. On September 21, 1988, Lehigh dispatched its concrete pump truck and an operator, defendant Joseph Franko, to the Second Street Pike worksite. Plaintiff alleged that he was injured when defendant Joseph Franko maneuvered the concrete pump truck into a power line.

Defendant Franko received his paycheck for services performed at the job site in question from defendant Lehigh and not DePaul. Only Lehigh had the right to hire and fire defendant Franko and not DePaul.

If the operator (Franko) found himself with what he considered a safety problem, he could refuse to perform that operation. If that meant refusing to do the job, it was Franko's option and Lehigh would support

the operator on that decision. The decision of whether to work near a power line was a personal choice for Franko; and if he did not want to work there, he would not be required to do so.

DePaul did not own its own concrete pump truck so it contracted Lehigh who had special expertise with this equipment. DePaul depended on Lehigh to send the correct size pump truck and a competent person to operate the pump truck.

Franko positioned the concrete pump truck in a location he chose. Mr. Connelly of DePaul did not choose the location. John Williams, Mr. Franko's supervisor at Lehigh, testified that he and Mr. Franko jointly decided where the concrete pump truck was to be positioned on the job site. Mr. Connelly, the foreman for DePaul, pointed out to Mr. Franko the location of the forms where the concrete had to be poured, but it was up to Mr. Franko, who was the expert, to determine what was the most efficient and safest way to pour the concrete. Mr. Connelly testified that Mr. Franko "would be the one to decide where he would have to stand to operate the concrete pump truck." (N.T. 4/25/95, p. 74.)

Mr. Franko was the only person on the site with the expertise to operate the concrete pump truck. Nobody was supposed to help Mr. Franko with the equipment. The pump truck pushed concrete into a boom attached to the truck. Mr. Franko positioned the boom by pulling various levers on a control box.Mr. Franko was the only one who pulled the levers on the control box. DePaul did not tell him how to move the levers. There was no lookout or signalman. The control box was connected to the concrete pump truck by a 100 foot cord; it permitted the operator to walk in any direction around the truck. It was Mr. Franko's respon-

sibility to ensure that the boom did not get within ten feet of overhead electrical power lines. The ultimate responsibility for control of the concrete pump truck rested in his hands as the operator of that equipment.

Mr. Franko further testified that he was responsible for the "safety of the men who were working at the site," such as Mark Cooper, who was standing on his metal truck that day. (N.T. 4/18/95, p. 2.181.) According to Mr. Franko, "when it came to the boom," he was responsible for the safety of the men who were working at the site, not Mr. Connelly, the foreman for DePaul, or anyone else. (N.T. 4/18/95, p. 2.182.)

On the day of the accident, Mr. Franko filled out a ticket for the work he did that day, indicating what time the concrete pump truck operator left the job, what time he got on the job, how many hours he was on the job, what time he was done with the job, what time he expected to return back to Lehigh, and how many yards of concrete he pumped that day. According to Mr. Franko, when he was done with a particular job, he was supposed to have the contractor (DePaul) sign the ticket. The ticket for the work Mr. Franko performed on the day of Mr. Cooper's accident was never signed by Mr. Connelly, or anyone else from DePaul, either on the day of the accident, or at any time thereafter. The backside of the job ticket contained pre-printed fine print on the back. This pre-printed language was as follows:

"Lessor and lessee agree that the leased equipment and all persons operating such equipment, including lessor's employees will be under lessee's exclusive jurisdiction, supervision and control during the time such equipment and operators are on lessee's job site." (N.T. 4/18/95, p. 2.172.)

Mr. Connelly, the foreman on the job site and an employee of DePaul, testified as follows:

"[By Counsel for Lehigh] Q: Sir, in terms of control at the project, in terms of everyday activities, things of that nature, and more specifically the operator of the concrete pump truck, who controlled the number of hours that person would be there?

"A: The operator?

"Q: Yes.

"A: Basically, we [DePaul] would. If it was a hundred-yard pour, we knew it was going to take two or three hours. We would tell John Williams, it was a half-a-day pour or an eight-hour pour or a ten-hour pour. We would tell him ahead of time.

"Q: You would direct where the operator went—

"A: To pour the concrete?

"Q: Yes.

"A: Yes.

"Q: Sir, if you made a determination that there was a dangerous condition that existed at the site, did you have the power to stop the job?

"A: Yes." (See Tr. trans. at 6.49-6.50.)

Mr. Franko's testimony included the following colloquy:

"[By Counsel for Lehigh] Q: Who determined how many hours you worked at the site?

"A: The customer.

"Q: The customer was?

"A: DePaul.

"Q: Who was it that determined what you did at the site?

"A: It's DePaul's job. They tell you what they want done.

"Q: Other than the physical operation of moving the boom and placing concrete at wherever they told

you to put it, were you responsible for any other activity associated with that boom?

"A: No.

"Q: Who was?

"A: DePaul.

"Q: Who was there representing DePaul at that time?

"A: The foreman, Joe Connelly.

"Q: If Joe Connelly told you to do something, what would you do?

"A: He leased us, so I would do whatever he wanted us to do. . . . 

"Q: Who controlled your activities on that job site?

"A: DePaul." (See Tr. trans. at 2.169-2.171.)

Lastly, John Williams, an employee of Lehigh at the time of the accident, testified as follows:

"[By Counsel for Lehigh] Q: Who tells the operator [Franko] what to do at the site?

"A: The job superintendent.

"Q: Does anyone at Lehigh tell him what to do in terms of his duties at the site, in terms of actual construction?

"A: No.

"Q: In your experience, who directs the activities of the operator at the site?

"A: The superintendent.

"Q: The superintendent at this job was who?

"A: To my understanding, a gentleman by the name of Joe Connelly.

"Q: He was employed by who?

"A: Tony DePaul." (See Tr. trans. at 6.57-6.58.)

Because the record is replete with disputed factual conclusions regarding the issue of whether Mr. Franko

was employed by Lehigh or DePaul at the time of the plaintiff's accident, the trial court properly submitted the borrowed-servant issue to the jury for decision.

There was sufficient evidence in the record for the jury to find that DePaul assumed in fact the power to control, that is, defendant Lehigh in fact transferred the right to control not only Franko's work but Franko's manner of performing.

Principle 7 of the *Mature* case requires that "when the facts are disputed, the determination is one of fact" for the jury as *fact finder.*

Accordingly, the issue was properly submitted to the jury.

## D. DID THIS COURT ERR IN FAILING TO INSTRUCT THE JURY PROPERLY ON BURDEN OF PROOF AND AFFIRMATIVE DEFENSES?

The plaintiff's argument involves the propriety of the trial court's charge to the jury. Specifically, the plaintiff asserts that the trial court erred when it failed to charge the jury that defendant Lehigh had the burden of proof "in their affirmative defense that Joseph Franko was an employee of DePaul." (Plaintiff's brief at 44.) Defendant did not, however, assert the borrowed-servant issue as an affirmative defense, but instead asserted this issue as a denial to plaintiff's allegation that defendant Lehigh was vicariously liable to the plaintiff for the actions of Joseph Franko.

It is well established in the Commonwealth that the burden of proof rests upon the party who has, through the pleadings, asserted the affirmative of an issue. *O'Neill v. Metropolitan Life Insurance Co.,* 345 Pa. 232, 241, 26 A.2d 898, 902 (1942). The defense has the burden of proving an affirmative defense. *Beato*

*v. DiPilato,* 175 Pa. Super. 602, 605, 106 A.2d 641, 642 (1954). Pennsylvania Rules of Civil Procedure 1029 and 1030 provide guidance in determining what constitutes an affirmative defense as opposed to a denial of an assertion of an opposing party. Pa.R.C.P. 1029 provides that "[a] responsive pleading shall admit or deny each averment of fact in the preceding pleading or any part thereof to which it is responsive." Pa.R.C.P. 1030 states that a party "may set forth as new matter any material facts which are not merely denials of the averments in the preceding pleadings."

In the instant action, defendant Lehigh, in its amended answer, denied the following averments of the plaintiff's complaint pursuant to Pa.R.C.P. 1029:

"(8) On the date and place [of the plaintiff's accident], said Ford 8000 concrete pump truck was owned, operated and controlled by defendant, Lehigh.

"(9) On the date and place [of the plaintiff's accident], defendant, Joe Franko, was employed by defendant, Lehigh.

"(10) On the date and place [of the plaintiff's accident], defendant, Joe Franko, was operating said Ford 8000 concrete pump truck within the course and scope of his employment with defendant, Lehigh." (Plaintiff's complaint at 3.)

Defendant did not assert the borrowed-servant issue as an affirmative defense as prescribed by Pa.R.C.P. 1030. However, as exhibited by paragraphs 8 through 10 of plaintiff's complaint as set forth above, plaintiff did assert vicarious liability against defendant Lehigh, thereby making it plaintiff's burden of proof to show by a preponderance of the evidence that at the time of plaintiff's accident, Joe Franko was working within the scope of his employment for Lehigh. Because defendant Lehigh denied said liability pursuant to

Pa.R.C.P. 1029, it did not have the burden of proving that at the time of the plaintiff's accident, Joe Franko was working for DePaul. As a result, defendant Lehigh is correct in its assertion that the trial court did not err in failing to charge the jury that defendant Lehigh had the burden of proof on the borrowed-servant issue.

In the *Friedline* case, *supra,* the claimant in this workmen's compensation case, Reynolds, was originally the employee of Conn [equivalent of Lehigh in our case], and Conn was named as the employer by Friedline in his claim petition. It was Conn who requested leave to join Friedline as an additional defendant to demonstrate Friedline's status as the second employer. Accordingly, the burden of proof in *Friedline* was upon Conn who asserted affirmatively in his pleading that Friedline was the employer. Conn did not *merely* respond negatively to a pleading against it. Friedline's [the equivalent of DePaul in this case] testimony is markedly different from the case at bar in that Friedline testified that "he did not feel that he had the authority to give specific orders to claimant or any other drivers because these drivers were not working for him." *Friedline, supra* at 44, 616 A.2d at 731. Thus, the court in *Friedline* found that Conn did not satisfy its burden of proof which it assumed when joining Friedline as an additional defendant.

In any event, this court properly charged the jury on the respective positions of the parties and in no way did the charge prejudice the plaintiff.

In the instant action, the plaintiff alleges that defendant Lehigh is vicariously liable to him based upon the actions of Lehigh's employee Joseph Franko. In order to successfully prove this theory, plaintiff had the burden of proving that at the time of the accident, Mr. Franko was working within the scope of his em-

ployment for Lehigh. As part of its defense, defendant Lehigh asserted that at the time of the accident, Mr. Franko was working for DePaul. These assertions are diametrically opposed. In other words, if the plaintiff failed to prove that Mr. Franko was an employee of Lehigh at the time of the accident, defendant's theory is implicitly accepted by the jury and vice versa.

Regarding the jury's decision-making process, the court instructed that:

"If you find from the evidence that the defendant Joseph Franko was the employee of the defendant Lehigh and was acting in furtherance of his employer's interests, activities, affairs or business, both defendants would be liable for any negligence of the defendant employee, Joseph Franko.

"If you find from the evidence that the defendant Joseph Franko was not the employee of the defendant Lehigh, then you could not find the defendant Lehigh liable vicariously to the plaintiff." (Tr. trans. at 8.91.)

Regarding the burden of proof, the court instructed that:

"Plaintiff has the burden of proof in order to recover and in order for this plaintiff to make a recovery from these defendants, the plaintiff has the burden of proving each of those contentions that would entitle him to relief." (Tr. trans. at 8.103.)

After setting forth the seven part test used to assess the borrowed-servant issue, enunciated by the Pennsylvania Supreme Court in *Mature, supra,* the court further instructed as follows:

"You have heard the arguments of the plaintiff, and you have heard the arguments of the defendant. It is the plaintiff's position that an employer-employee relationship existed with Lehigh. They argued that the

presumption that the driver of the truck, that there is a presumption that the driver of the truck remains the employee of Lehigh. Lehigh was the one that made the choice of what driver to send. Lehigh had the right to hire and fire the driver. There was special knowledge and skill required of the job and Franko had that skill. He was only employed at a daily or hourly rate. And, that the defendant Lehigh did not or—strike that, and that DePaul did not control the manner in which the work was performed. It was Franko that controlled how he did his work. Therefore, for all of these reasons, the plaintiff argues that Lehigh maintained control over Franko and Franko was employed by Lehigh.

"Nonsense says the defendant, that was not the case. The defendant argues and urges you, argued on the basis of his interpretation of the evidence that no employer/employee relationship with Lehigh was in effect at the time of the occurrence, which is important.

"The defendant says, sure he was an employee, but that ceased when he leased the services of Franko to the contractor.

"The defendant argues that the contract itself between Lehigh and the contractor show that the contractor controlled Mr. Franko and the defendant argues that the contractor controlled Franko's activity at the time of the occurrence and reimbursed Lehigh for the use of Franko, and argues the other party, the contractor, could have even ejected him. So, therefore, the defendant is saying it was DePaul, it was the contractor who was the employer of Franko at the time of the occurrence. Therefore, there is no vicarious liability on the part of defendant Lehigh." (Tr. trans. at 8.117-8.119.)

The record establishes that the trial court properly instructed the jury and the charge, when viewed in its entirety, accurately apprised the jury of all relevant

concepts of law at issue. There was no error committed when the court stated that the plaintiff had the burden of proving every element of his case. See *O'Neill v. Metropolitan Life Insurance Co., supra.* As stated by the court in its instruction, the plaintiff had the burden of proving that at the time of the accident, Mr. Franko was employed by Lehigh. If the jury found that the plaintiff did not meet its burden of proof on this issue, as it in fact did, the defendant was entitled to judgment as a matter of law on the issue of vicarious liability.[1] In addition, and more importantly, if the jury found that the plaintiff did not meet its burden of proof on this issue, it was implicitly stating that the defendant had presented sufficient evidence to rebut the plaintiff's theory and shown that at the time of the plaintiff's accident, Mr. Franko was an employee of DePaul.

By instructing the jury regarding each party's theory of liability on the issue of vicarious liability, the substance of each party's burden of proof was addressed. Because the plaintiff was not prejudiced in any way by the court's instruction, because the charge accurately apprised the jury of all relevant issues before it, and because the substance of the defendant's defense of liability was addressed in the charge, the trial court properly instructed the jury.

Accordingly, it is clear that the jury verdict was in accord with the evidence in this record and that no error was committed.

---

1. Upon finding that defendant Lehigh was not vicariously liable to plaintiff, the jury was then asked to determine whether Lehigh in its own right was negligent in causing plaintiff's injury. On the separate issue of defendant Lehigh's negligence, the jury returned a decision in favor of the defendant.